1

2                                         **E-Filed 9/29/06**

3

4

5

6

7 NOT FOR CITATION

8 **IN THE UNITED STATES DISTRICT COURT**

9 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10 **SAN JOSE DIVISION**

11

| | |
|---|---|
| IN RE | Case Number C 05-4709 JF |
| JTS CORPORATION, a Delaware corporation, fka ATARI CORPORATION, | ORDER RE TRUSTEE'S APPEAL |
| Debtor. | |
| SUZANNE L. DECKER, Trustee, | |
|                    Appellant-Plaintiff, | |
|       v. | |
| JACK TRAMIEL, | |
|                    Appellee-Defendant. | |

24        Appellant-Plaintiff Suzanne L. Decker, the chapter 7 bankruptcy trustee ("the Trustee")

25 appeals the bankruptcy court's judgment in her adversary proceeding against directors, attorneys

26 and shareholders of the debtor company, JTS Corporation ("JTS"). The Court, having

27 considered the briefing of the parties as well as the oral arguments presented at the hearing on

28 September 8, 2006, resolves the appeal as follows:

# I. BACKGROUND

JTS was formed in 1994 to design, manufacture and market a smaller, slimmer hard disk drive to be used in personal computers.  JTS suffered serious financial setbacks in 1996 when it lost a major contract with Compaq.  JTS then merged with Atari Corporation ("Atari") in order to obtain much-needed funds.  Atari's chairman of the board, Jack Tramiel ("Tramiel"), became a member of JTS's board of directors following the merger.  Among the other directors on JTS's board at that time were its chairman, Jugi Tandon ("Tandon"), and its president and chief executive officer, David Mitchell ("Mitchell").

Following the merger, JTS liquidated real and intellectual property in an effort to generate sufficient cash to stay afloat.  However, by July 1997 the disk drive market was glutted.  JTS abandoned production of a smaller disk drive and pursued a new business model based on a very low-cost, high capacity disk drive.  These efforts were unavailing.  JTS was forced into bankruptcy through involuntary petition in November 1998 and subsequently filed a voluntary petition for relief under chapter 11, scheduling assets of $4.2 million and liabilities of $136 million.  The case converted to chapter 7 in January 1999.

The Trustee filed an adversary proceeding against JTS's directors and attorneys as well as a major shareholder, alleging claims of breach of fiduciary duty, preference, fraudulent conveyance, equitable subordination, avoidance of transfers, illegal redemption of shares, legal malpractice, alter ego liability, unfair business practices, aiding and abetting and conspiracy.

 The bankruptcy court adjudicated certain aspects of the Trustee's claims in an order addressing the parties' cross-motions for summary judgment issued September 30, 2003 ("Summary Judgment Order").  Subsequently, Tandon, Mitchell and the attorney defendants reached settlement with the Trustee, under which the settling defendants paid the estate $4.5 million.  On April 23, 2005, the bankruptcy court issued an order approving good faith settlement.

The adversary proceeding went to trial against only one defendant, Tramiel.  The bankruptcy court issued an opinion following trial on September 30, 2005 and entered judgment on October 31, 2005.  The judgment stated that Tramiel was liable in the amount of $1,387,185

Case No. C 05-4709 JF
ORDER RE TRUSTEE'S APPEAL
(JFLC2)

plus prejudgment interest and explicitly stated that Tramiel was not entitled to a settlement credit for the prior $4.5 million settlement of his co-defendants. Tramiel filed a motion to amend the judgment to permit him a settlement credit. That motion was heard on December 22, 2005 and was granted on the same date. An amended judgment was entered on January 19, 2006 providing that Tramiel may apply a settlement credit in the amount of $4.5 against his liability. This amendment to the judgment in effect reduced Tramiel's liability to zero, because the $4.5 settlement credit exceeded the amount for which he had been adjudicated liable.

## II. LEGAL STANDARD

A bankruptcy court's factual findings are reviewed for clear error and its legal conclusions are reviewed *de novo*. *In re Strand*, 375 F.3d 854, 857 (9th Cir. 2004). A bankruptcy court's grant of summary judgment is reviewed *de novo*. *In re Lee*, 335 B.R. 130, 135 (BAP 9th Cir. 2005).

## III. DISCUSSION

The Trustee's appeal focuses on three transactions addressed by the bankruptcy court, addressed in turn as follows:

**A.      The Real Estate Transaction**

The 1996 merger with Atari did not solve JTS's cash problems. In mid-1996, JTS's chief financial officer approached Tramiel about purchasing a portfolio of eight real properties that JTS had acquired from Atari as part of the merger. Tramiel agreed to purchase the entire portfolio of properties for total book value of $10 million, with JTS retaining an option to repurchase for $10 million within the first year. If JTS exercised the option, Tramiel would keep the greater of $1 million or the rental income generated by the properties during the one-year option period. The option expired without being exercised. Tramiel subsequently transferred the real property portfolio to an entity for the benefit of his children.

The Trustee asserted that the sale of the real properties to Tramiel was avoidable as a constructive fraudulent conveyance under 11 U.S.C. § 544(b), which provides that a trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." "[T]o the

3

1    extent that a transfer is avoided under section 544 . . . the trustee may recover, for the benefit of

2    the estate, the property transferred, or, if the court so orders, the value of such property." 11

3    U.S.C. § 550(a). "In seeking recovery of such monies, the trustee stands in the overshoes of the

4    debtor corporation's unsecured creditors." *In re Agricultural Research & Tech. Group, Inc.*, 916

5    F.2d 528, 534 (9th Cir. 1990).

6        The Trustee invoked § 544(b) to apply California's fraudulent conveyance laws.

7    Specifically, the Trustee looked to California Civil Code § 3439.04(a), which provides *inter*

8    *alia* that a transfer is fraudulent if made by a debtor who did not receive "reasonably equivalent

9    value" and either (a) the debtor was engaged or was about to engage in business for which the

10   debtor's remaining assets were unreasonably small in relation to the business or (b) the debtor

11   intended to incur or should have believed that he would incur debts beyond his ability to pay as

12   they became due. Cal. Civ. Code § 3439.04(a). California Civil Code § 3439.07 sets forth the

13   remedies for a fraudulent transfer, providing that, "subject to the limitations in Section 3439.08,"

14   a creditor may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy

15   the creditor's claim." Cal. Civ. Code § 3439.07(a). The limiting provision, California Civil

16   Code § 3439.08, provides that to the extent a transfer is voidable under § 3439.07, a creditor

17   "may recover judgment for the value of the asset transferred, as adjusted under subdivision (c), or

18   the amount necessary to satisfy the creditor's claim, whichever is less." Cal. Civ. Code §

19   3439.08(b). Subdivision (c) provides that judgment shall be equal to the value of the asset at the

20   time of the transfer, "subject to adjustment as the equities may require." Cal. Civ. Code §

21   3439.08(c). Subdivision (d) provides an additional limitation, stating that "[n]otwithstanding

22   voidability of a transfer or an obligation under this chapter, a good faith transferee or obligee is

23   entitled, to the extent of the value given the debtor for the transfer or obligation, to ... [a]

24   reduction in the amount of the liability on the judgment." Cal. Civ. Code § 3439.08(d)(3).

25       Applying California Civil Code § 3439.04, the bankruptcy court found that JTS did not

26   receive "reasonably equivalent value" for the properties and that JTS was insolvent at the time of

27   the transaction. The bankruptcy court's finding of insolvency appears to be a kind of shorthand

28   for satisfaction of the requirement that (a) the debtor was engaged or was about to engage in

4

1    business for which the debtor's remaining assets were unreasonably small in relation to the

2    business or (b) the debtor intended to incur or should have believed that he would incur debts

3    beyond his ability to pay as they became due.  *See* Cal. Civ. Code § 3439.04(a)(2).  Satisfaction

4    of these elements is not at issue in this appeal.

5          With respect to the requirement that the debtor did not receive "reasonably equivalent

6    value," the bankruptcy court concluded that the eight properties had an aggregate fair market

7    value of $15,760,000 at the time of the sale.  However, for purposes of determining "reasonably

8    equivalent value," the court discounted the fair market value 20% because the properties were

9    bundled and discounted an additional 5% for the quick sale.  The court thus concluded that for

10   purposes of determining "reasonably equivalent value" at the time of sale the properties fairly

11   could be valued at $11,820,000.  The court further concluded that the value JTS received in

12   exchange for the properties was the $10 million in cash plus the value of the repurchase option,

13   which the court put at $432,815.  Based on these valuations, the court found that JTS received

14   $1,387,185 less than the value of the properties sold, and thus did not receive "reasonably

15   equivalent value."  Accordingly the court concluded the transfer was fraudulent under California

16   Civil Code § 3439.04.

17         The court concluded further that the Trustee could avoid the transaction pursuant to

18   California Civil Code § 3439.07(a)(1).  However, it found that Tramiel had acted in good faith in

19   purchasing the property, and therefore that under California Civil Code § 3439.08(d), Tramiel

20   was entitled to a reduction of his liability by the amount he had paid JTS.  The court thus

21   concluded that the transfer was avoidable in the amount of $1,387,185 – the fair value of the

22   property at the time of transfer less the value that Tramiel paid.

23         Finally, the bankruptcy court concluded that Tramiel was entitled to a credit for the $4.5

24   million settlement entered into by his co-defendants.  Because the credit was greater than

25   Tramiel's liability, the bankruptcy court concluded that Tramiel's net liability was zero.

26         The Trustee asserts that the bankruptcy court's calculation of Tramiel's liability was

27   erroneous.  Specifically, the Trustee asserts that once the *avoidability* of the transfer is

28   determined pursuant to state law, the *amount* of Tramiel's liability should be determined

5

1   pursuant to 11 U.S.C. § 550(a), which the Trustee asserts imposes liability in the amount of the

2   full market value of the property transferred and does not make any provision for reduction for

3   consideration paid.  In short, the Trustee asserts that the proper approach is to determine whether

4   the transfer was fraudulent under California Civil Code § 3439.04, but to omit the specific

5   limitation on liability for such fraudulent transfer – i.e., reduction in liability in the amount of

6   value given the debtor – imposed by California Civil Code § 3439.08(d).

7         **(1)    Interplay Between Bankruptcy Code And California Fraudulent Transfer**

8                  **Law**

9         This appears to be a novel issue of law.  As noted above, the bankruptcy court's legal

10  conclusions are subject to *de novo* review.  The parties have not cited, and the Court has not

11  discovered, any cases expressly addressing the interplay between 11 U.S.C. §§ 544(b) and 550(a)

12  on the one hand, and California Civil Code § 3439.08(d) on the other hand.  The Trustee relies

13  heavily upon the Ninth Circuit's decision in *In re Acequia, Inc.* for the proposition that once a

14  transfer is identified as fraudulent under state law, the extent of the recovery is governed solely

15  by 11 U.S.C. § 550(a).  *Acequia* is not precisely on point, however.  In that case, the debtor-in-

16  possession, Acequia, invoked 11 U.S.C. § 544(b) to apply Idaho's fraudulent conveyance laws,

17  specifically a provision deeming fraudulent any conveyance made with actual intent to defraud.

18  The magistrate judge concluded that the transfer in question was fraudulent under this provision

19  but, reasoning that Acequia's rights under § 544(b) derived from those of its unsecured creditors,

20  limited Acequia's recovery to the total amount of unsecured claims against the bankruptcy estate.

21  The Ninth Circuit held that this limitation was erroneous, stating that once a trustee has

22  established the *right* to avoid a transfer under 11 U.S.C. § 544(b) – that is, under applicable state

23  law – the *amount* of such recovery is governed by 11 U.S.C. § 550(a).  *In re Acequia*, 34 F.3d

24  800, 809 (9th Cir. 1994).  Consequently, if a trustee establishes that a particular transfer is

25  avoidable under state law because it is fraudulent as to a particular creditor, the transfer may be

26  *entirely* avoided regardless of the size of the creditor's claim.  *Id.* at 809-10.  The extent of the

27  trustee's recovery is governed by 11 U.S.C. § 550(a), which requires only that recovery be for

28  "the benefit of the estate."

                                                  6

1    The rule of *Acequia* may be summarized as follows:  a trustee may avoid a fraudulent

2    transfer to the full extent permitted under applicable state law, even if such avoidance exceeds

3    the amount of the unsecured creditors' claims, if such avoidance is for "the benefit of the estate."

4    The bankruptcy court that adjudicated Tramiel's liability in this case applied this very rule in *In*

5    *re Serrato*.  In that case, the bankruptcy court addressed language in California Civil Code §

6    3439.07 limiting a creditor's recovery for fraudulent transfer to the amount necessary to satisfy

7    the creditor's claim.  The Court held that this express state statutory limitation on a creditor's

8    right to recover for fraudulent conveyance did *not* limit a trustee's right to recover under 11

9    U.S.C. §§ 544(b) and 550(a), citing *Acequia* for the proposition that "[t]he Bankruptcy Code

10   separates 'the concepts of avoiding a transfer and recovering from the transferee.'"  *In re Serrato*,

11   214 B.R. 219, 231 (1997) (quoting *Acequia*, 34 F.3d at 808).  The bankruptcy court also cited

12   *Acequia* for the proposition that "[a]lthough the trustee has demonstrated her right to recovery

13   under state law, she must still establish the amount of recovery pursuant to § 550(a) of the

14   Bankruptcy Code."  *Id.*

15       The question before this Court is whether the limit on liability imposed by California

16   Civil Code § 3439.08(d), expressly reducing a California creditor's recovery for fraudulent

17   transfer, should be disregarded in a similar manner on the ground that the amount of recovery for

18   a fraudulent transfer is governed solely by 11 U.S.C. § 550(a).  As noted above, there do not

19   appear to be any published opinions squarely addressing this precise issue.  However, two

20   published decisions clearly assume – albeit without discussion – that similar setoff provisions in

21   other states' fraudulent conveyance laws apply when those laws are invoked via 11 U.S.C. §

22   544(b).  In *In re Agricultural Research & Tech. Group, Inc.*, the Ninth Circuit noted that under

23   the applicable Hawaii fraudulent transfer law, a good faith transferee is entitled to recover any

24   value given in the transaction.  *Agricultural Research*, 916 F.2d at 539.  The court ultimately

25   determined that the transferee had failed to demonstrate good faith, but it is clear from the

26   decision that had the transferee made a showing of good faith the court would have concluded

27   that the transferee was entitled to a setoff for value given in the transaction.

28       The *Agricultural Research* decision predates *Acequia*.  However, a published bankruptcy

7

court decision rendered several years after *Acequia* reaches the same result.  In *In re Viscount Air Services, Inc.*, the trustee invoked § 544(b) to apply Arizona's fraudulent conveyance law.  *In re Viscount Air Services, Inc.*, 232 B.R. 416, 432 (Bankr. D. Ariz. 1998).  Under Arizona law, a transferee who takes in "good faith" is entitled to set off the amounts paid for the transfer.  *Id.* at 440.  The bankruptcy court found that the transferee acted in good faith and thus was entitled to a setoff to the extent of monies paid for the transfer, and that to rule otherwise would unfairly penalize the transferee.  *Id.*  The bankruptcy court did not expressly consider the impact of *Acequia* and its progeny in reaching this decision.

Because these decisions do not squarely address the relevant issue, their persuasive authority is quite limited.  However, the decisions do demonstrate that at least two courts have assumed that state law setoff provisions like the one at issue here are swept into 11 U.S.C. § 544(b) along with provisions defining a fraudulent conveyance.  Moreover, although the Trustee correctly points out that California Civil Code § 3439.08(d) properly is characterized as a limit on *liability* rather than a limit on *avoidability*, the statutory provision authorizing avoidance states expressly that a creditor may obtain avoidance "subject to the limitations in Section 3439.08."  Accordingly, while acknowledging that the appropriate interplay of the Bankruptcy Code and California's fraudulent conveyance law is far from clear in the present context, the Court concludes that the bankruptcy court properly permitted Tramiel to set off the value he gave for the properties when adjudicating his liability.

### (2)    Whether Tramiel Acted In Good Faith

The Trustee argues that even if the good faith setoff provided in California Civil Code § 3439.08(d) applies, the bankruptcy court erred in finding that Tramiel acted in good faith.  The bankruptcy court's factual finding of good faith is reviewed for clear error.   After reviewing the record, as well as the bankruptcy court's careful reasoning on this point, this Court has no difficulty concluding that the bankruptcy court's finding of good faith was not clearly erroneous.

### (3)    Proper Methodology For Calculating Tramiel's  Liability

This Court agrees with the Trustee that the bankruptcy court erred when it calculated Tramiel's liability.  Assuming without deciding that the bankruptcy court's discounting of the

8

properties' fair market value was appropriate for the purpose of determining whether JTS

received "reasonably equivalent value," the Court is not persuaded that "reasonably equivalent

value" is the appropriate measure of Tramiel's liability.

The Bankruptcy Code provides that the trustee may recover "the property transferred" or

alternatively "the value of such property." 11 U.S.C. § 550(a). The statute does not define

"value." However, the majority of cases addressing the issue have held that fair market value is

the appropriate starting point for determining liability in a fraudulent transfer case. *See, e.g., In

re Kemmer*, 265 B.R. 224, 236 (Bankr. E.D. Cal. 2001) (holding that appropriate measure of

liability under 11 U.S.C. § 550(a) was the value of the equity transferred, that is, the fair market

value of the property less its encumbrances); *In re Walter*, 261 B.R. 139, 145 (Bankr. W.D. Pa.

2001) (holding that appropriate measure of liability under 11 U.S.C. § 550(a) is fair market value

of transferred property); *In re Vann*, 26 B.R. 148, 149 (Bankr. S.D. Ohio 1983) (using fair market

value as measure of liability under 11 U.S.C. § 550(a)); *Matter of Nevada Implement Co.*, 22

B.R. 105, 107 (Bankr. W.D. Mo.1982) (stating that fair market value is appropriate measure of

liability under 11 U.S.C. § 550(a)). The Court thus concludes that the appropriate measure of

liability is the fair market value of what Tramiel acquired – the properties and the rents – less any

value he gave JTS. The bankruptcy court found that the experts had established the fair market

value of the properties to be $15,760,000 and the fair market value of the rents to be $1,387,185,

for a total fair market value of $17,147,185. Tramiel gave JTS $10 million in cash plus an option

to repurchase that the bankruptcy court valued at $432,815, for total value given by Tramiel of

$10,432.815. Tramiel's liability thus is $17,147,185 with a setoff of $10,432,815, or

$6,714,370.


### (4)    Availability Of Settlement Credit

Approximately one year before the adversary action went to trial against Tramiel, the

bankruptcy court approved a settlement agreement between the Trustee, Tandon, Mitchell and

the attorney defendants. The settlement agreement provided that the settling defendants would

pay the Trustee a total of $4.5 million. Settlement Agreement ¶ 1.1. The settlement agreement

9

explicitly allocated the $4.5 million to particular claims, as follows:

> The Settlement Sum shall be paid as follows:  (1) The Attorney Defendants shall pay $3,075,000 which the Trustee allocates to the claims of malpractice related to Series B and C and forgiveness of indebtedness. . . .  (2) Mitchell shall pay $600,000 and Tandon shall pay $825,000, which payments the Trustee allocates to the claims related to the forgiveness of promissory notes and the repurchase of those shares with those notes.

*Id.*  The settlement agreement contains an integration clause providing that the settlement agreement contains the full expression of the parties' agreement.  *Id.* at ¶ 16.  All of the settling defendants signed the settlement agreement.

Pursuant to California Civil Procedure Code § 877, a good faith settlement bars a nonsettling defendant from seeking contribution from settling defendants, but the nonsettling defendant's liability is reduced by the settlement amount to the extent that all defendants are claimed to be joint tortfeasors.  *McComber v. Wells*, 72 Cal. App. 4th 512, 516-17 (1999).  As noted above, the settlement agreement explicitly allocated the settlement funds to malpractice claims and other specified claims distinct from the fraudulent transfer claim against Tramiel. Accordingly, it appears from the face of the settlement agreement that Tramiel may not obtain a settlement credit for any of the settlement funds.  However, when it approved the settlement agreement, the bankruptcy court expressly reserved the right to determine whether Tramiel was liable as a joint tortfeasor on any claim in the event Tramiel made a future request for settlement credit by Tramiel.

The trial went forward as against Tramiel approximately one year later.  Tramiel did not request a finding of joint liability on any claim, nor did the bankruptcy court make such a finding. Based upon the allocation in the settlement agreement and the lack of any finding that Tramiel was a joint tortfeasor in the settled claims, the bankruptcy court stated explicitly in its original judgment that Tramiel was not entitled to a settlement credit.

Upon Tramiel's post-trial motion, the bankruptcy court entered an amended judgment on January 19, 2006, providing that Tramiel is entitled to a settlement credit in the amount of $4.5. In an opinion recited orally, the bankruptcy court stated that the second amended complaint made clear that all defendants were considered joint tortfeasors and conspirators.  The court also noted

that the settlement agreement indicated that only "the Trustee" had agreed to the agreement's allocation of settlement funds, and there was no evidence that the settling defendants agreed to this allocation.  Finally, the court noted that it had reserved the right to allocate culpability amongst the defendants upon Tramiel's request for a credit.

The Trustee characterizes the bankruptcy court's conclusion that Tramiel is entitled to a settlement credit as a legal determination.  Tramiel characterizes the issue as a factual one.  This Court concludes that the issue presents mixed questions of law and fact.  The Court further concludes that the determination that Tramiel is entitled to a settlement credit was clearly erroneous.  The integrated written settlement agreement clearly and expressly allocates the $4.5 in settlement funds to claims other than the claim upon which Tramiel was found liable.  While the text of the settlement agreement does recite that "the Trustee" allocates the funds in this particular way, all of the settling defendants signed the integrated written settlement agreement, indicating their agreement to this term.  There is *no* evidence in the record that any of the settling defendants disagreed with the allocation recited in the settlement agreement.  The bankruptcy court clearly assumed that the allocation was valid at the time it approved the settlement, and expressly reserved authority to make a finding of joint liability as to the settled claims at Tramiel's request.  There is *no* evidence in the record that Tramiel ever made such a request.  Accordingly, this Court concludes that Tramiel is not entitled to a settlement credit.

**B.    Debt Relief**

In 1996, JTS granted directors Tandon and Mitchell stock options to purchase one million shares of JTS common stock at an exercise price of $1 per share.  They exercised their options, using full-recourse promissory notes with the stock pledged as security.  Neither made any payments, and the notes were in default by spring 1997.  By July 1997, the value of JTS stock had plummeted and the two million shares were worth less than the debt Tandon and Mitchell had incurred to purchase them.  Tandon and Mitchell requested relief from these debts.  The JTS board agreed.

The Trustee asserts that the debt relief was an illegal stock purchase under 8 Del. C. § 160, providing in relevant part that "no corporation shall:  (1) Purchase or redeem its own shares

11

1   for cash or other property when the capital of the corporation is impaired."  The Trustee asks that

2   this Court hold Tramiel liable for Tandon's $1 million debt (it is unclear why the Trustee doesn't

3   ask the same for Mitchell's debt).

4           The bankruptcy court made very explicit findings that the debt relief was *not* a purchase

5   or redemption of shares, but rather an incentive for Tandon and Mitchell to stay with the

6   company.  This Court concludes that those factual findings were not clearly erroneous.

7   **C.    Repayment Of Atari Bridge Loan**

8           In late 1997, JTS decided to sell certain intellectual property rights obtained in the merger

9   with Atari.  JTS needed interim financing to maintain its operations while it negotiated the sale.

10  The Amber group, consisting of JTS shareholder Amber Arbitrage, Tandon, Mitchell and

11  Tramiel, put up $3 million secured by the Atari intellectual property.  In February 1998 JTS sold

12  the intellectual property for $ 5 million, repaid the $3 million loan with interest, and had

13  approximately $2 million more in cash than had been available several months previously.

14  While conceding that the bridge loan in essence was an advance on the sale of intellectual

15  property that enabled JTS to maintain operations for the months needed to consummate the sale,

16  and that the transaction as a whole resulted in an additional $2 million in corporate funds, the

17  Trustee asserts that the repayment of the $3 million was a breach of Tramiel's fiduciary duty and

18  thus is void.  Specifically, the Trustee asserts that because JTS was insolvent at the time the $3

19  million loan was repaid, repayment of a loan to corporate directors ahead of other creditors was a

20  *per se* breach of those directors' fiduciary duties under Delaware law.[1]

21          The bankruptcy court considered and rejected this theory and ultimately granted summary

22  judgment for the defendants on this claim.  The bankruptcy court's Summary Judgment Order set

23  forth an extensive history of Delaware law relevant to interested director transactions, and

24  concluded that even when the corporation is insolvent such a transaction is not *per se* void.

25  Summary Judgment Order at 3-11.  The bankruptcy court concluded that under Delaware law,

26  ────────────────

27          [1] Claims against directors based upon the internal affairs of the corporation are governed
    by the law of the state of incorporation.  *See In re Sagent Tech., Inc., Deriv. Litig.*, 278 F. Supp.
28  2d 1079, 1087 (N.D. Cal. 2003).

                                                    12

1   the Trustee has the initial burden to establish the existence of an interested director transaction,

2   and that once this burden is established, the defendants bear the burden of proving that the

3   transaction was entirely fair to the corporation's creditors. *Id.* at 11.  The bankruptcy court then

4   concluded as a matter of law that based upon the undisputed facts in the record the Atari bridge

5   loan and its repayment were entirely fair to JTS and its creditors.

6          Delaware case law does not provide a particularly clear road map with respect to

7   interested director transactions in the context of corporate insolvency.  This Court has reviewed

8   the relevant authorities, dating back to the 1930s, and concludes that the legal standard

9   articulated by the bankruptcy court is the appropriate one and that the conclusion that the

10  transaction was fair is well supported by the record.

11                                  **IV. ORDER**

12         The judgment of the bankruptcy court is AFFIRMED IN PART and REVERSED IN

13  PART as follows:

14         (1)    With respect to the real estate transaction, the bankruptcy court's judgment is
                  AFFIRMED IN PART AND REVERSED IN PART; Tramiel is liable on the
15                fraudulent conveyance claim in the amount of $6,714,370 plus prejudgment
                  interest and is not entitled to a settlement credit;
16
17         (2)    With respect to the debt relief transaction, the bankruptcy court's judgment is
                  AFFIRMED; and
18
           (3)    With respect to the Atari bridge loan, the bankruptcy court's judgment is
19                AFFIRMED.

20  DATED:  9/29/06

21

22                                              _____
                                                JEREMY FOGEL
23                                              United States District Judge

24

25

26

27

28

                                        13

1   This Order was served on the following persons:

2

3   Christian B. Nielsen      cbn@robinsonwood.com

4   Daniel Rapaport      drapaport@wendel.com, calendar@wendel.com; gcone@wendel.com

5   Jeffrey C. Wurms      jwurms@wendel.com, calendar@wendel.com; nschrager@wendel.com

6   Mai T. Buell
    Law Offices of Robinson and Wood
7   227 N. First Street #300
    San Jose, CA 95113
8
    Marilyn Morgan
9   U.S. Bankruptcy Court
    280 South First Street, Room 3035
10  San Jose, CA 95113

11  USBC Manager-San Jose
    US Bankruptcy Court
12  280 South First Street, Room 3035
    San Jose, CA 95113

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 05-4709 JF
ORDER RE TRUSTEE'S APPEAL
(JFLC2)